First case for argument 19-28-75 Melissa Maris versus the Curators of the University of Missouri et al. Very well, Mr. Smith. We'll hear from you first. Thank you, Your Honor. May it please the Court. My name is George Smith, and I represent Dr. Melissa Maris, who has a PhD degree in clinical psychology from Miami University and completed her postdoctoral fellow at Yale University of Medicine. As Missouri Supreme Court held in Daltrey, summary judgment should seldom be used in employment discrimination cases because such cases are inherently fact-based and often depend on inferences rather than on direct evidence. The Court must be particularly deferential to the non-movement. The record in this case is voluminous and presents a legion of disputed material facts. The defendant presented 208 uncontroverted material facts, 90 of which were disputed by the plaintiff. Dr. Maris presented 415 uncontroverted material facts, 52 were disputed. Answering five key questions is crucial to a determination of whether summary judgment was appropriate in this case. Number one, what were the criteria and standards for achieving promotion and tenure? Were they the same in the ESCP and the EPLA departments? The facts were undisputed and said, yes, they were. There was no material difference between those standards, and they were clear standards, and they had objective criteria associated with them. Number two, were the criteria and standards specific enough to permit consistency of assessment of candidates? Or were they so vague and ambiguous that they permitted administrators to interpret them to comport with their own biases? Number three, what were the standards expected of administration in this case? Did they have unfettered discretion to decide whether a candidate had met the department's guidelines? Number four, were there administrators who could influence the process to achieve or promote a specific outcome for a candidate? The facts there are clear that, yes, there were. The case of Zi Wang is particularly instrumental in that point. Number five, if these administrators agreed, and they did, that consistency was instrumental in assessing candidates. Consistency being, you had to, when you had different candidates come up for promotion and tenure, you had to apply the rules consistently to them, and if they were informed of a prior decision of allegations of inconsistencies that favored male candidates over female candidates, were those administrators under a duty or institutional imperative to investigate the data and information presented to them of gender bias? In other words, when the academic tenure regulations speak of excellence in a candidate scholarship, are the same standards of excellence applied to male and female candidates, or did they permit a moving goalpost for male and female candidates? If consistency is not practiced, this leaves the backdoor open for the thief of discrimination to enter. The institution must be committed to consistency despite frequent turnover of administrators and committee members. Without consistency, the institution, in effect, gets a get-out-of-jail-free card to claims of discrimination because they can say, well, we didn't compare anybody else. Well, if you don't compare somebody else, how do you know discrimination has ever happened? There's no way to determine it. Nowhere in this record, and this is key to this, nowhere in the record of this case did any administrator assert that an investigation was not warranted because the people that Maris was comparing her records to were not comparable. In other words, the chancellor, the provost, the dean, any of the committees, they never said, well, we don't need to do a comparable assessment because you're not comparable to those people. They just didn't do it. And yet both experts, both parties' experts said that was the standard. To ensure consistency, you have to do a comparison to make sure that every candidate is being treated the same. Mr. Smith, what, when you say that, when you assert that the female candidates and the male candidates, if I understand your position, is that they were held to different standards for purposes of tenure. Is that correct? That's correct. And can you tell me what the differences are in particular? Well, the most notable case, if you look at the record, was Dean Clay's interpretation of the criteria and standards of the ESC department. Remember, his department voted five to zero, that he had not met those standards. And he came in and gave a very, very broad, liberal interpretation of those standards because they had very specific Category A publications and Category B publications. And he said, in my interpretation, comparative has met those criteria and standards and that rescued his candidates because he was going down. Now, he didn't give Dr. Mears the same benefit of the doubt. He didn't give her that because if he'd given her that liberal interpretation, she would have had probably 25 publications. She had 15, which was more than the 10 to 12. That's the most clear example. The other example, though, was of Marks and Riley Kilmer. She was better than all the male comparators and they said she didn't meet the standards. So they produced a moving goal post that favored the men and didn't favor the women. So when you're talking about a standard, are you just saying that it's so subjective that there is no standard? Because I'm not hearing a particular standard, like the men were held to this type of publication or this number of publications and the women were held to another standard. It sounds like it's just, from your view, it's completely subjective? That there is no standard? No, that's the problem, is that the standard was not subjective. It was 10 to 20 high-quality peer-reviewed publications and the department was required under the provost call letter to designate, in writing, what it considered to be high-quality journal articles and it didn't do that. This department never followed that provost call letter. So how were candidates to know what was high-quality other than they published all in peer-reviewed journal articles and then book chapters were in Category A and certain grant publications were in Category A. So these are very objective standards, but it was the dean, in this case, particularly the dean, but also Martins and Reilly Tillman, infused their own interpretation on those objective standards to say men met them, but women didn't. I don't know if that correctly answers your question, but that's the best I can give you right now. I've lost my timer, so you guys will have to shut me off when I'm done. You have seven minutes remaining. I took five for rebuttal, so that means I have two. You may stop for rebuttal whenever you wish, but the clock is at seven minutes. Okay. I think the other part I want to deal with, and maybe this, your honor, this gets to your question about are these standards subjective? And the court had said that the nature of each candidate's dossier is inherently unique, and that was one reason for denying sermon judgment, and I was kind of like, does he understand, and surely he must, that in the academic setting, every person has a subdisciplines in the law, and so every dossier is going to be unique. To have dossiers that were the same, that would make no sense, but what's in a dossier, like various letters and external letters and your curriculum vitae and your copies of your publications, that's all a standard set, but what's in those documents is inherently unique because it's unique to the individual. So that seemed to be just some kind of a conclusory statement that didn't have any factual basis to justify why sermon judgment should be granted, and I'm going to assume I've got about five minutes left, so I'm going to stop there. You have five minutes and 40 seconds, so if you want to go a little longer, we'll let you know when you're down to five. Okay, the last thing I'll discuss then is the issue of similarly situated, and I think the facts and the law here, the law is pretty clear. There are three criteria for being similarly situated. Were they applying for similar jobs? Yes. All of these comparators were at the assistant professor level applying for promotion and tenure to associate professionals. Was there similar conduct? Of course there was. They were all required to, under their guidelines, to do teaching, research, and service, to serve on committees, to seek out grants. That's all the same, okay? And then the last one is, did they deal with the same supervisor? And the answer to that is yes. In some place, all of these comparators dealt with the same supervisors. And not all the supervisors, there's basically, you got your department chair, your division director, and your dean. These are your supervisors. These are the people that determine your raises, where you get promoted, where your office is, they do your performance evaluations. So they didn't have the same three people all the time, but there was overlap between these supervisors among all the four comparators. At least one of those was the same for all three of them, all four of the people at the time. What about the fact that, wasn't Loftin, though, the ultimate decision maker for Marist, and he was not the decision maker for the comparators? And does that matter? He was not the decision maker for, I think you're correct, your honor. He was not the decision, I think Brady Deaton was the decision maker for Kurz. I don't know who it was for Whitney. It may have been Loftin, it may have been Deaton. And I think that the legal question then is whether the fact that the decision maker here is different than the comparators decision maker means that they're not similarly situated comparators. Do you agree with that? It does not mean that because Loftin is not their supervisor. He does not make those day to day decisions that affect a person's job performance or determine how they work. He's not their supervisor. He is merely an administrator who is the ultimate decision maker based on information that's provided to him about whether a person should get promoted or tenured. All right, would you like to reserve the remainder for rebuttal? Please, your honor. All right, very well. Thank you for your argument. Mr. Beidler, we'll hear from you. May it please the court. I think opposing counsel's argument is clearly advise the court that this is a tenure denial case. It's a case that arises out of the university's decision to deny the appellant tenure. And as such, this is a case that's governed by the rule that this court applied in the Kamiah v. Iowa State case, where this court recognized that there are unique facts and circumstances surrounding promotion and tenure decisions. Those decisions are different from a lot of employment decisions because they are inherently subjective. They're multifaceted. They involve many different viewpoints with lots of participants, and those participants are exercising specialized knowledge. These unique circumstances, coupled with the fact that the university's promotion and tenure decisions implicate the principle of academic freedom, resulted in this court applying a rule that in order to demonstrate discrimination in this context, a plaintiff has to point to more than a mere dispute about her qualification. She has to show that the tenure denial was obviously unsupported. That's the rule that this court applied in Kamiah to the Title VII claims that were before it, and it applies with equal force to the MHRA claims that are also present in this case. Title VII and the MHRA may require different degrees of causation, but they both require the plaintiff to prove discrimination. And just like the decision that this court examined in Kamiah, the university's decision to deny appellant promotion and tenure was a discretionary decision that involved subjective standards, specialized knowledge, multiple factors, many different viewpoints from many different participants. Counsel, are there differences that we need to be aware of with respect to the federal claims and the state claims, or are they more or less judged on the same basis? The facts underlying the claims are the same. The difference is that the MHRA only requires the plaintiff to prove causation as a contributing factor, while the Title VII claims require the plaintiff to prove that discrimination was a motivating factor. But they both require the plaintiff to give rise to an inference of discrimination. And I'm sure there are cases where the issue of discrimination… Oh, I'm sorry, Mr. Hoosier, I'm sorry. Does this principle that before the decisions can be overturned, it has to be obviously unsupported, is that a principle that is at home in a state claim as well as a federal claim? It is, Your Honor, because it is a principle that's been adopted by this court and other courts around the country that reflects the federal court's experience with deciding discrimination claims in the context of promotion and tenure. It's not a different burden or a different standard. In every discrimination claim, the plaintiff's evidence has to be evaluated in light of the facts and the circumstances. No, no, but I mean, in these particular kinds of cases, there's a considerable thumb on a scale in favor of the university's decision. That's what I'm talking about. Is that a thumb on a scale that is at home in a state claim as well? It is, because what that thumb deals with is when a court will draw… Do you have any… I mean, does the state courts apply that standard? I am not aware of, and I don't believe my opposing counsel has cited any Missouri state court case examining a discrimination claim in the context of promotion and tenure. We did cite a case in our brief where a state court has recognized that the promotion and tenure decision is an inherently subjective decision. It's a decision that's going to be made based on people who know the candidate, who are familiar with their scholarship, and who have formed an opinion. And that all these different opinions will be presented during the process, and then it will ultimately be up to a final decision maker to decide which viewpoint is correct. Okay, thank you. Thank you, Your Honor. Do you want to elaborate on why you think we should predict that Missouri courts would adopt the standard applied in Kamiah when considering a state law claim? That seems to be what you're saying, but you haven't really explained why. Yes, Your Honor. Both Missouri and federal courts have recognized that the plaintiff's evidence of discrimination must be evaluated in light of the facts and circumstances of the challenged employment decision. And that it's not enough in either federal or state court to simply show that the employer's decision was wrong. In Kamiah, this court illustrated that the rule that it was applying was not a different rule, but it was an application of a rule in the context of promotion and tenure. It cited cases that are not promotion and tenure cases that stand for the proposition that it's not sufficient for a plaintiff to simply show that the decision was wrong. Or that the decision may have been based on mistaken facts. The plaintiff ultimately has to provide evidence that shows that the decision was based on discrimination. And it is perhaps, at this point, an appropriate time to talk about a disagreement that we have with the point that was pressed by my opposing counsel. The record in this case does not show that the university standards for promotion and tenure were objective standards. Those standards are set forth in the university's collected rules and regulations, which are enumerated in our statement of uncontroverted material facts in which we're not disputed. And they describe the standard for tenure as a high standard. And particularly in the area of research, which is the area that's at issue in this case. Candidates must show that they are exceptional scholars. They made an impact on their discipline and that their research activities are at the highest level. Similarly, appellants department established guidelines for promotion and tenure. These guidelines are not sufficient. The university's collected rules and regulations say the satisfaction of minimum departmental guidelines doesn't guarantee tenure. But what those guidelines say is that a candidate should have 10 to 12 high quality publications that establish an empirical and programmatic line of research. When you talk about that, when there's a reference to the high quality journals, my sense is that there are different types of research that the various candidates are engaged in. And it seems to me that it might be that certain types of research lend themselves more to what are kind of typically called high quality journals than others. Is that the case? I want to be sure that I keep my response to what's in the record, your honor. And I think what's in the record is that appellant complained that she didn't have a sufficiently clear understanding of what was considered high quality journals. But what the record reflects is that over the course of her probationary period, appellant received annual reviews, which looked at the articles that she had published so far and informed her that those were not in high quality journals. Right. And so I guess my question is that whether and I understand that the record is showing that there was some communication about whether the journal she was publishing in were of the type that they wanted to see. But I guess my question, when you start out saying this is such a subjective approach and then you add in layers of each dossier is very particular, is unique, and that it is hard to compare them because you don't want seven researchers doing the exact same thing that are easily compared. So it seems to me that it would at least open up the door to possible discrimination if, in fact, for example, the women candidates have or tend to to find themselves in areas of research that the journals just aren't accepting as many The high quality journals aren't accepting as many articles. So it seems to me that they're sort of baked into the subjectivity, the potential for gender discrimination. I wonder if you could speak to that and how the university would protect against that. Certainly, I think there's two responses. First, this case doesn't involve the type of impact. And secondly, this issue is why looking at the record of recommendations and evaluations is so important. The cases regarding promotion and tenure from this court and from other courts, they recognize that there is inevitably going to be some subjectivity and some application specialized knowledge here. And what the court is looking for to determine whether the reasons that were proffered for a tenure denial were discrimination or not, is, in the words of the Zohoric case, reasoned doubt. Is there evidence in the record that supports the evaluation that was offered by the university? And here we have consistent evaluations over the pre-tenure period. We have external reviewers outside the university who describe the publications, the journals that the plaintiff is publishing in as being second tier journals. We have evaluations at every level of review, including the College Committee, which unanimously recommended against Appellant and Appellant has not accused of discrimination, indicating that she published in second tier journals. There were seven levels of review in the Appellant's promotion and tenure process. All of them initially recommended against her for the same reasons. Concerns about the quality of the outlets of her publications, whether they had sufficiently rigorous science in them, and whether she had published enough of them as first author to demonstrate that she was the leader of her own programmatic line of research. And even the campus committee, which was the only committee that reversed its recommendation after appeal and recommended in her favor, they acknowledged that these were legitimate concerns. In light of that consistent record, it's simply not sufficient for Appellant to disagree with it and argue that because the standards are subjective, there must be evidence of discrimination. It is her burden to prove facts that show discrimination. And the principal way that she attempts to do that in this case is through comparators, but she doesn't get across the line there either. Both Missouri and federal law recognize that for a comparator to be relevant, the comparator must be similarly situated in every relevant circumstance. And in this case, Appellant is trying to use her comparators in a way that does not match that standard. So with respect to her male comparators, she is not alleging that they were treated differently from her in the same ways that she was criticized for the denial of tenure. She claims that two of her male comparators were not criticized for having a certain number of publications. My opposing counsel mentioned the dean, Dan Clay, who I think he described as offering a tortured analysis of the departmental minimum publication requirements. First of all, it's undisputed that Dean Clay did not criticize Appellant based on the number of her publications. His recommendation in her favor expressly states that she satisfied the minimum number of publications, and Appellant cannot show that she was similarly situated with him in all respects and was treated differently when he treated her the same as her alleged comparators in this area. And I think that the argument about a tortured explanation drives home the fact that Appellant's arguments really are about disagreeing with the decision, disagreeing with the substantive judgment of her scholarly merit and her comparator's scholarly merit because what happened in Dr. W's case is the department concluded that he had met their guidelines, recommended in his favor. The department chair recommended in his favor, concluded that he had met department guidelines, and the college committee disagreed. The fact that Dean Clay just disagreed with the college committee and agreed with two other committees that doesn't give rise to an inference of disparate treatment. It's just a dispute over two candidates' qualifications, and that is not going to be sufficient to raise an inference of discrimination. While we're on the subject of comparators, my opposing counsel mentioned Dr. Wong, who is not, strictly speaking, a comparator. She's another female candidate who two of the participants in her promotion and tenure process also recommended against. And that is another type of either comparator or me-too evidence that just simply doesn't raise an inference of discrimination. First of all, to the extent that Appellant is trying to make a statistical evidence argument, two people isn't enough to raise a statistical inference, and in any event, it's undisputed that Dr. Martens and Dr. Raleigh Tillman, the majority of the candidates they reviewed were women, and they recommended in favor of all of them except Appellant and Dr. Wang. And Appellant's argument that Dr. Wang was I believe I'll quote here, better than all the male comparators, is again, that's the same type of appraisal and dispute of qualifications that the Kamai case says isn't going to be sufficient to raise an inference of discrimination. What is true with the Wang case is that Appellant actually argues not that she was dissimilarly treated, but that she was similarly treated with Dr. Wang with similar scholarly qualifications, and that argument actually enforces the legitimacy of the decision that was made, not undermines it. I see that I'm about out of time, and I just want to briefly mention there is a second claim in this case, claim for breach of the duty of good faith and fair dealing. That claim is not an express contract claim. It's not a negligence claim, and it's not a discrimination claim. To establish that claim, Appellant had to show that the university exercised discretion in bad faith. The denial of tenure is a decision that is vested in the university as a discretionary decision. Appellant had the burden to show that the university made that decision in a way that was in bad faith or is arbitrary or capricious. And again, the process that the university followed to make that decision prevents her from making that showing. We had a multi-level review process with notice and an opportunity to respond at every level, and the fact that Appellant disagrees with the outcome does not show that the university's decision was arbitrary or capricious. Thank you very much for your time. All right, thank you for your argument, Mr. Beidler. Mr. Smith, you have three minutes and 13 seconds remaining for rebuttal. We'll hear from you next. I'll speak fast. I want to address your issue about Laughton being just a chancellor on Dr. Maris's claim. He was also the chancellor in Zee Wong's case, and he denied her also. Now, Dr. Maris, and this addresses the other judge's thing about are things inherently subjective. Dr. Maris presented to the chancellor and the provost and the dean very specific tables showing the quality of the journals, the placement of the journals, the number of journals published, the impact factors, the Z factors associated with those journals. She presented all this information for all the comparators and herself, and they didn't even investigate whether those criteria or whether they were true, not true. They didn't look into it at all, even though she brought it up. So she didn't just go in and say, I think I'm being discriminated against. She provided them very detailed and specific data, objective data, saying, look, here's my record. Here's their record. Why do the men get tenure and the women don't? Me and Zee Wong. And Zee Wong's record, if you look at the data, she was clearly superior to everybody, and she was denied. She had, out of 30 people that voted on her promotion and tenure, 24 of them recommended her for promotion. The only administrators that didn't, Martins and Riley Tillman, for the exact same reasons, they denied Maris, and yet Zee Wong's publications, by any objective standards, met all the high quality programmatic criteria. Now, I want to say the other thing about annual reviews. Mr. Violet raised the point that she got consistent annual reviews, and that's not true. She didn't even get any annual reviews the first two years, which they were required to give her. And she was always unanimously recommended for a continuance on the promotion and tenure track, and she met every expectation they put down for her. She presented this in data, it's in the record, that they told her what she needed to do to be successful. She did all of that. And then, how much time I got left? 48 seconds. Okay, very good. Again, going back to Loftin. So, even though he's presented data on two other comparators that he didn't make a decision on, he could have gone back and looked at their record, and he could have said, well, what did Chancellor Deaton look at? How did he apply these same standards, these same criterion guidelines to these two individuals' records, so I can use that and make sure I'm consistent in applying them to these individuals' records, and he didn't even do that. I mean, that, if that's not enough to raise an inference that someone has infected this process in a way that is discriminatory towards women, that makes, that holds them to a higher standard than what male candidates are held to, I don't know that such a thing, I don't know how you would prove it then, unless somebody was just stupid enough to say, well, we're not going to give you promotion and tenure because you're a female. I think the evidence is abundant, that there's plenty of evidence to raise a material fact that these things should be decided by a jury and not a court. Thank you, Your Honor. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted, and the court will file an opinion in due course. Counsel.